**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Jessco, Inc., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Builders Mutual Insurance Co., and )<br>Arrowood Indemnity Co., )<br>)<br>Defendants. )<br>_____)<br>)<br>Builders Mutual Insurance Co., )<br>)<br>Counter-Plaintiff, )<br>)<br>v. )<br>)<br>Jessco, Inc., )<br>)<br>Counter-Defendant. )<br>_____)<br>)<br>Arrowood Indemnity Co., )<br>)<br>Counter-Plaintiff, )<br>)<br>v. )<br>)<br>Jessco, Inc., )<br>)<br>Counter-Defendant. )<br>_____) | C.A. No.: 2:08-CV-1759-PMD<br><br>**<u>ORDER</u>** |

This matter is before the court upon Defendant Arrowood Indemnity Co.'s and Defendant Builders Mutual Insurance Co.'s Motions for Summary Judgment. Based on the following, the court grants in part and denies in part both Defendants' Motions for Summary Judgment.

**BACKGROUND**

On September 19, 2003, Plaintiff, Jessco, Inc. entered into a contract with Glenn and Tracie Mazyck for the construction of a home in the Coosaw Creek subdivision located in North Charleston. Unlike the typical construction arrangement, where the builder assumes responsibility for the construction of the home, the Mazycks agreed to be responsible for certain aspects of their homes' construction. As explained by Jeff Stahl, the President of Jessco:

> [Jessco's] role was to deal with the [Coosaw Creek Architectural Review Board], put the foundation in, frame the house, do the roughing, do the exterior, pretty much build the home. [The Mazycks'] role was to paint. They were responsible for landscaping, flooring. Their father-in-law was going to do the cabinets. So, it was, I guess what you'd call a joint effort. But technically, we were the builder.

(Stahl Dep. 20:3–10.) Under the contract, however, Jessco was responsible for complying with all building codes, zoning, and homeowners' association requirements at no additional cost to the owner. Based on information obtained from several surveys conducted prior to the construction of the home, the Coosaw Creek Architectural Review Board ("Review Board") expressed a concern over the adequacy of the elevation height of the first finished floor of the home and garage, due to the low elevation of the lot and surrounding areas. Jessco understood the Review Board's concern to be over the ability to connect to the municipal sewer system. The Review Board also recommended that a professional landscape architect or an engineer design the appropriate drainage plan for the site.

Construction of the Mazyck residence began in October 2003 and subcontractors of Jessco and the Mazycks performed all of the work. To alleviate any problems created by the Mazyck residence not having a sufficient elevation to connect its sewer line to the North Charleston sewer system, Jessco, without asking for the Mazycks' approval, pre-wired the residence for a grinder pump, also known as a sewage lift station, which would mechanically

compensate for any deficiencies in the elevation. Jessco also raised the elevation of the residence by one cinder block. By April 15, 2004, the Mazyck residence was in the painting stage. While the exterior was complete and the interior drywall and trim were up, the cabinets, counters, flooring, finish plumbing, finish electric, finish HVAC, driveways, and landscaping had not been completed. By August 23, 2004, the City of North Charleston issued a certificate of occupancy for the Mazyck residence.

Shortly after moving into their new home, the Mazycks began to notice construction defects which were causing problems, and on September 9 and October 5, 2004, they provided Jessco with a list of things to be fixed or replaced. After the problems persisted and Jessco failed to fix the items on the lists, the Mazycks filed suit against Jessco and several other subcontractors, alleging that certain construction defects existed in their house. The Mazycks complained of three primary defects: (1) "[t]he Residence was not constructed at an elevation that would allow proper drainage of sewage from the Residence to the City of North Charleston's sewage system," and "in an attempt to alleviate the sewage drainage problem Defendant Jessco installed a sewage grinder pump [that not only failed to] alleviate the problem, but the pump is in direct violation of the [Review Board's] regulations and applicable state and federal health codes;" (2) "[t]he lot on which the Residence is situated was not properly graded to allow sufficient runoff of surface water into the wetlands buffer adjacent to the Residence, thus causing flooding of the lot;" and (3) "[f]urther defects exist on the interior and exterior of the Residence which were outlined in the September 9, 2004 Addendum to the Contract . . . and . . . October 5, 2004 certified letter to Defendant." (Compl. ¶¶ 11–16.)

During this time, Jessco held a commercial general liability ("CGL") policy issued by Defendant Arrowood Indemnity Co. ("Arrowood") with effective dates of April 15, 2003 to

3

April 15, 2004 ("Policy"). Thereafter, Defendant Builders Mutual Insurance Co. ("Builders Mutual") issued a CGL policy to Jessco with effective dates of April 15, 2004 to April 15, 2005. Although the Mazycks served Jessco with a summons and complaint on March 2, 2005, Jessco did not make Arrowood aware of the Mazycks' suit until September 27, 2007 and Builders Mutual aware until October 23, 2007, approximately two and one-half years later. Both Arrowood and Builders Mutual denied any duty to defend or indemnify Jessco pursuant to the policies they issued. In response, Jessco filed a declaratory judgment action, seeking a declaration of the rights and obligations of the parties pursuant to the insurance contracts. Since the filing of this suit, the Mazycks and Jessco have arbitrated their underlying litigation, and the arbitrator issued his original award on April 23, 2009 and an amended award on May 27, 2009. He awarded the Mazycks $54,863.90 in damages.

## **LEGAL STANDARD FOR SUMMARY JUDGMENT**

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party is

'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327.

## ANALYSIS

### I. Coverage Under the Policies

Pursuant to both Arrowood's and Builders Mutual's policies with Jessco, they agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The policies applied to bodily injury or property damage "only if (1) [t]he bodily injury or property damage is caused by an occurrence," and the policies defined "occurrence" as "an accident,[1] including continuous or repeated exposure to substantially the same harmful conditions." Both Arrowood and Builders Mutual primarily contend that since no bodily injury or property damage "occurred" at the Mazycks' residence, it does not have a duty to defend or indemnify Jessco. Therefore, the issue before the court is whether the construction defects and property damage alleged by the Mazycks constitute occurrences under Arrowood's and Builders Mutual's policies.

In *L-J, Inc. v. Bituminous Fire and Marine Insurance Co.*, the South Carolina Supreme Court, interpreting a CGL policy with language identical to that used in both Arrowood's and Builders Mutual's policies, held that property damage to the work product alone, caused by faulty workmanship, does not constitute an "occurrence." 366 S.C. 117, 123, 621 S.E.2d 33, 36

---

[1] In the absence of a prescribed definition in the policy, the South Carolina Supreme Court has used the following definition of "accident": "an unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt." *Auto Owners Ins. Co. v. Newman*, Op. No. 26450, 2009 S.C. LEXIS 447, at *6 (S.C. Sept. 8, 2009) (citing *Green v. U. Ins. Co. of America*, 254 S.C. 202, 206, 174 S.E.2d 400, 402 (1970)).

5

(2005). Moreover, the South Carolina Court of Appeals has held that any liability that is incurred because of faulty workmanship is part of the insured's contractual liability, not an insurable event under a CGL policy. *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 319 S.C. 12, 16, 459 S.E.2d 318, 320 (Ct. App. 1994). Recently, the Supreme Court again addressed the issue of whether certain alleged property damage constituted an "occurrence" under a CGL policy. *Auto Owners Ins. Co. v. Newman*, Op. No. 26450, 2009 S.C. LEXIS 447 (S.C. Sept. 8, 2009). In *Auto Owners Ins. Co. v. Newman*, a subcontractor had negligently installed stucco on a home, and as result, moisture seeped into the home causing substantial water damage to the home's exterior sheathing and wood framing. Interpreting policy language identical to that before this court, the Supreme Court found that, although the subcontractor's negligent application of stucco did not on its own constitute an occurrence, the continuous moisture intrusion resulting from the subcontractor's negligence is an occurrence defined by the CGL policy at issue. *Id.* at *10–11. Essentially, since there was property damage beyond that of the defective work product itself, the Court found that the homeowner's claim was not merely for faulty workmanship typically excluded under a CGL Policy. *Id.* at *10.

With this legal framework in mind, the court analyzes the parties' arguments as to the three construction defects and problems alleged in the Mazycks' complaint.

## II.     Grinder Pump

As discussed above, to alleviate any problems created by the Mazyck residence not having a sufficient elevation to connect its sewer line to the North Charleston sewer system, Jessco, without the Mazycks' approval, pre-wired the residence for a grinder pump, also known as a sewage lift station, which would mechanically compensate for any deficiencies in the elevation. In their complaint, the Mazycks allege that "not only did this not fix the problem, but

6

the pump is in direct violation of Coosaw Creek Architectural Review Board Regulations and applicable state and federal health codes." Jessco believes the court should consider this problem in conjunction with the other alleged construction defects, since it is one defect of many that the Mazycks rely upon in their Complaint. The court disagrees. While Jessco alleges that an expert suggested one remedy to the Mazycks' alleged problems is to demolish the entire home and rebuild it, it is clear that the Mazycks have not claimed property damage to any other part of their home due to any defect existing in the grinder pump. To the extent that Jessco would have the court view the grinder pump as a defect which led to the flooding of the Mazycks' back yard or the intrusion of water into their garage, it has not provided any evidence to support such a position. In fact, from Jessco's own brief, it appears that the grinder pump failed only twice as the result of debris, such as toiletry products, clogging its line, but after the debris was removed, the pump worked properly and has continued working without any problem since. (Resp. to Arrowood's Mot. for Summ. J. at 7 n.1.) Moreover, when asked if the Mazycks experienced any damage to their house as a result of the grinder pump backing up, Mr. Stahl testified at his deposition that there was no water backup and no water damage to the house.

The arbitrator of the underlying litigation between Jessco and the Mazycks also found in his award that the Mazycks have not experienced any damage to their home as a result of the grinder pump. Although he found that that the grinder pump was unsightly, perhaps poorly located, and plugged into an electrical receptacle rather than hardwired, which could easily be corrected, he also found that the Mazycks have not had a problem with it within the last four years. Since Mr. Stahl testified that the grinder pump could be eliminated, as the Mazycks sewer line could be connected to the City of North Charleston's sewer system, the arbitrator awarded the Mazycks $7,000 for this to be accomplished. Therefore, to the extent the Mazycks alleged

"property damage" because of the installation and use of a grinder pump, the court finds that any damage was to the product itself. Thus, there was no "occurrence" which entitles Jessco to coverage for this claim under its CGL policy with either Arrowood or Builders Mutual.

Even if the failing of the grinder pump on two occasions constituted an "occurrence," both Arrowood's and Builders Mutual's policies excluded from its coverage, "[p]roperty damage to that particular part of any property that must be restored, repaired, or replaced because your work was incorrectly performed on it." The Arrowood policy defined "your work" as "[w]ork or operations performed by you or on your behalf; and [m]aterials, parts or equipment furnished in connection with such work or operations." Since the only defects alleged to exist in the pump are restricted to the pump itself, since the arbitrator awarded the Mazycks a replacement of the pump with a tie-in to North Charleston's municipal sewage system, and since Jessco admits that it performed the work associated with installing the grinder pump,[2] the court would also find that both Arrowood's and Builders Mutual's policies excluded coverage for this claim.

## III. List of Things to Be Fixed

Also in their complaint, the Mazycks allege that "defects exist on the interior and exterior of the Residence which were outlined in the September 9, 2004 Addendum to the Contract . . . and . . . October 5, 2004 certified letter to Defendant." Shortly after moving in, the Mazycks provided Jessco with several "punch list items" to be fixed or replaced, which included such requests, among others, as sanding and painting behind a bathroom mirror, replacing a kick plate on the front door, sanding, trimming, and painting the skylights in the master bedroom, and acid washing bricks, while replacing bricks that were cracked. Jessco agreed to make the repairs, and as a result, the list became part of the contract between the two parties. Jessco ultimately fixed or

---

[2] In its Response in Opposition to Builders Mutual's Motion for Summary Judgment, Jessco stated, "Some of the work was, of course, performed by Jessco itself, most notably the selection of the grinder pump installed to solve certain plumbing connection issues." (Mem. in Opp. at 2.)

8

replaced all of the items on the Mazycks' list, except for five items: (1) sanding and painting behind the mirror in the bathroom, (2) replacing a scratched kick plate on the front door, (3) completely fixing the driveway ears, (4) fixing the covered front porch, and (5) completing all cabinetry. In his award, the arbitrator found the items of this list "appear to be predominately cosmetic issues and minor repairs, the bulk of which seem to have been satisfactorily completed." (Arrowood's Supp. Mem. Ex. 2 at 13 n.2.)

Just recently, the South Carolina Court of Appeals acknowledged that, "the current law of this state appears to be that a commercial general liability policy is intended to provide coverage for tort liability for physical damage to property of others, but not for the insured's contractual liability which causes economic loss." *Auto-Owners Ins. Co. v. Rhodes*, Op. No. 4605, 2009 S.C. App. LEXIS 376, at *29 (Ct. App. August 6, 2009) (citing *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 319 S.C. 12, 459 S.E.2d 318 (Ct. App. 1995), *aff'd*, 321 S.C. 310, 468 S.E.2d 304 (1996)). The Mazycks did not allege any property damage beyond Jessco's improper performance of these items under their contract; therefore, the court also finds that Jessco's failure to fix or replace some but not all of these items requested by the Mazyks does not constitute property damage caused by an occurrence. Thus, Arrowood's and Builders Mutual's Motions for Summary Judgment are granted as to these claims.

## IV. Flooding of the Mazycks' Property

The final, and by far the biggest, complaint of the Mazycks is that the lot on which their home was constructed was not properly graded to allow sufficient runoff of surface water into the wetlands buffer adjacent to their house, thus causing flooding of the lot. As a result of the flooding, the Mazycks claim that water infiltrates their garage and covers the driveway. At the hearing before the arbitrator, the Mazycks had several expert witnesses testify about the flooding

9

of their lot and offer their opinion as to what caused the flooding. Martin Baker, Sr., a principal of Archispec Building Inspectors who holds a Master Home Inspector's License, performed an exterior inspection of the home. His son, Martin Baker, Jr., also conducted an investigation. Both men listed the water intrusion into the utility room floor and walls as the single most significant repair issue to the property and noted that the neighboring properties sat higher than that of the Mazycks. Both men, however, also concluded that neither the grinder pump nor the grading of the property is the primary reason for the excessive flooding; rather, they testified that the flooding occurred primarily because of the overall condition of the property. In particular, the men found the fact that the property sits adjacent to wetlands, which are at full capacity due to an increase in the number of residences throughout the Coosaw Creek development, as the primary cause for the flooding of the Mazycks' yard.

In addition to the Bakers' conclusions, Joseph Shahid, an engineer for Applied Building Sciences, prepared a report in which he also found that there was a grade difference between the Mazycks' property and their neighbors'. Furthermore, Charles Beam, a hydrologist for Applied Building Services, also conducted an inspection related to the flooding issues on the Mazycks' property. Mr. Beam is licensed as a Professional Engineer in South Carolina and holds a nationally recognized license as a Registered Professional Hydrologist. He found that the Mazycks' lot was below the level of the roadway in front of it; however, he also found that many of the lots in the Coosaw Creek subdivision were also situated below the roadway level. Although he did not see the property after a rainfall, he estimated that the property would not drain within 48 hours. Like the Bakers, Mr. Beam also concluded that the wetlands adjacent to the Mazycks' lot experienced over-capacity as a result of the neighboring golf courses and residences and that this would necessarily cause water to run out of them and onto adjacent

properties when there was rain. According to the arbitrator, Mr. Beam reached the following conclusion:

> [T]he cause of the major water build-up and retention problems in [the Mazycks'] yard was the direct result of the design of the development, and that all of the specific issues regarding which he had testified—the elevation of the yard relative to the roadway, the distance between the house and the wetlands, the flooding of the garage and the runoff from the wetlands onto the property—were caused entirely by the acts of the developer, not the builder. He was unable to identify any builder acts or failures to act that might have resulted in the water intrusion complained of in the Complaint.

(Arrowood's Supp. Mem. Ex. 2 at 10.) The final expert to testify on behalf of the Mazycks was their new contractor, Larry Cantley, who has 20 years' experience as a residential contractor. He testified that a contractor has a duty to ensure that, before he or she builds a house, it will sit properly on the lot, taking into consideration the topography of the lot and surrounding environment, and he or she must ensure the lot is properly graded and elevated so that it drains properly. Mr. Cantley offered several possible remedies to the flooding issue, the most drastic being the complete demolition of the home, the regrading of the lot, and the rebuilding of the house—a suggestion the arbitrator dismissed as economically wasteful.

Based on the evidence and testimony presented to him, the arbitrator found that the proximate cause of the flooding to the Mazycks' property is the over-capacitation of the wetlands, caused by the overall design and development of the surrounding neighborhood, and that Jessco's work is not the legal proximate cause of the flooding of Claimant's property. Despite reaching this conclusion, the arbitrator still assigned some degree of fault to Jessco after acknowledging that the siting and elevation of the house are the responsibility of the builder. Thus, he awarded the Mazycks $10,000 for damages for flooding as well as for some regrading of the lot to better manage surface water flow. The arbitrator did not specify whether any of this award was attributed to damage to the Mazycks' garage due to water intrusion.

11

Builders Mutual argues Jessco is not covered under its policy since all of the claims alleged by the Mazycks relate to faulty workmanship and since its policy excludes from coverage any property damage to any property that must be restored, repaired, or replaced because Jessco's work was incorrectly performed on it or because of worked incorrectly performed by Jessco's subcontractors on its behalf. Arrowood contends that because the arbitrator explained in his modified award that he awarded the Mazycks $10,000 to give them the "benefit of their bargain," that coverage cannot exist since such a ruling recognizes the contractual nature of the defect. Additionally, Arrowood contends that the arbitrator's award "is at best compensation for the repair or replacement of defective work, not damages arising from the defective work." Based on these arguments, Arrowood believes that Jessco is not covered under its policy for these claims. The court disagrees with both parties' assertions.

Pursuant to both of their policies, Arrowood and Builders Mutual agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Both policies define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of the use of that property," and they provide that "[t]he insurance applies to . . . 'property damage' only if . . . the 'property damage" is caused by an occurrence that takes place in the "coverage territory." As already quoted, both Arrowood's and Builders Mutual's policies' definitions of "occurrence" includes unexpected or unintended property damage caused by continuous or repeated exposure to substantially the same general harmful conditions."

The flooding of the Mazycks' yard constitutes "property damage" as defined by both policies. *See Horry County v. Ins. Reserve Fund*, 344 S.C. 493, 500, 544 S.E.2d 637, 641 (Ct. App. 2001) (finding that flooding falls within the ordinary meaning of physical injury to

property). The retained water on their lot has caused them to lose the use of their yard at times, as well as caused water damage to their garage. Furthermore, the flooding is caused by an "occurrence," as defined by the policies, because it is the result of continuous and repeated exposure to substantially the same harmful condition, the adjacent wetlands and ineffective grading of their property. As a result, Jessco is obligated to pay the Mazycks $10,000 for damages for flooding, such as the water damage suffered by the Mazycks' garage, and the additional regrading of the lot, which is a sum that Jessco became legally obligated to pay as damages because of property damage to which Arrowood's and Builders Mutual's policies apply. Therefore, the court finds that coverage does exist for the claims related to flooding asserted against Jessco. *See Auto Owners Ins. Co. v. Newman*, Op. No. 26450, 2009 S.C. LEXIS 447, at *10–11 (Sept. 8, 2009) (finding that the continuous moisture intrusion resulting from defective stucco is an occurrence defined by the CGL policy at issue).

Finally, Arrowood contends that even if the court finds that Jessco is obligated to pay a sum of money for property damage caused by an occurrence it is still entitled to summary judgment because the work related to the grading of the Mazycks' property was performed after the expiration of its policy. Again, Arrowood issued a CGL policy to Jessco with effective dates of April 15, 2003 to April 15, 2004. In Jessco's Response to Interrogatories, Jessco admitted that as of April 15, 2004, the house was in the painting stage, as the exterior was complete. Furthermore, the interior drywall and trim were up; yet, the driveways and landscaping had not been completed. Arrowood also references Mr. Stahl's deposition testimony to support its argument, in which Mr. Stahl testified that an initial grade of the lot was completed first to establish a pad for the foundation of the home. After the home is completed, a rough grade is then done to create the driveway and sidewalks, and after the driveway and sidewalks are

13

poured, a final grade is completed, which ensures that the sod has a smooth surface to lie on so the yard will not be bumpy. (Stahl Dep. 41:22–42:21.) Because Jessco admitted that the driveways were not completed as of April 15, 2004, Arrowood argues that the final grade of the lot was not completed until after the expiration of its policy. Since Mr. Stahl testified that the final grade is a point at which any drainage issues can be addressed, Arrowood contends that any issues relating to water retention on the Mazycks' property occurred after the expiration of its policy.

While drainage issues may be addressed during the final grade of the property, Mr. Stahl also testified that the final grade is usually done at the "very, very end right before you move in." (Stahl Dep. 42:8–10.) The main cause of the flooding was the location of lot to an adjacent wetlands as well as the location of the home on the lot. Jessco picked the lot and the site of the home well before the final grade was complete. And while Mr. Stahl testified that drainage issues can be addressed during the final grade of the property, the final grade appears to merely make sure the underlying landscape has a smooth surface to ensure the sod lies flat. Arrowood has not provided any evidence that it was not until the final grade of the Mazycks' lot that the grading and flooding issues arose, and the court finds it hard to believe that a builder would not address a major draining issue, which requires the regrading of a lot, during the initial grade as opposed to waiting until the "very, very end right before a [homeowner] moves in." As there is no dispute that as of April 15, 2004, the exterior of the Mazycks' home was completed, the court finds that the problems related to the flooding of the Mazycks' lot existed prior to the expiration of Arrowood's policy and that the Mazycks' claim falls within the effective dates of its policy.

## V. Jessco's Failure to Notify Arrowood and Builders Mutual of the Mazycks' Claims in a Timely Manner

Lastly, Arrowood and Builders Mutual contend that they are entitled to summary judgment because Jessco failed to provide timely notice of the underlying litigation between it and the Mazycks. "Where a question exists as to the failure of an insured to comply with the notice requirements contained in a liability insurance contract, the burden of proof rests with the insurer." *Vt. Mut. Ins. Co. v. Singleton by & ex rel. Singleton*, 316 S.C. 5, 10, 446 S.E.2d 417, 421 (1994). Both CGL policies required Jessco to give Arrowood and Builders Mutual notice of an occurrence that might give rise to a claim against Jessco "as soon as practicable." *See id.* at 12, 446 S.E.2d at 422 ("Where a notification provision is to be enforced, the court will interpret the term "as soon as practicable," as meaning within a reasonable time frame.") (citation omitted). Although the Mazycks served Jessco with a summons and complaint on March 2, 2005, Jessco did not make Arrowood aware of the Mazycks' suit until September 27, 2007 and Builders Mutual aware until October 23, 2007, approximately two and one-half years later. In *Vermont Mutual Insurance Co. v. Singleton*, the South Carolina Supreme Court stated:

> The purpose of a notification requirement is to allow for investigation of the facts and to assist the insurer in preparing a defense. Where the rights of innocent parties are jeopardized by a failure of the insured to comply with the notice requirements of an insurance policy, the insurer must show substantial prejudice to the insurer's rights.

*Id.* at 11–12, 446 S.E.2d 417, 421 (1994). Since the rights of the Mazycks, the innocent third-party to this dispute, may be jeopardized by the failure of Jessco to comply with the notice requirements of its insurance policy with Arrowood and Builders Mutual, Arrowood and Builders Mutual bear the burden of showing that Jessco's failure to timely notify them of the underlying litigation substantially prejudiced their rights. Arrowood contends that it has been substantially prejudiced by Jessco's failure to timely notify it of the Mazycks complaints as

15

Jessco opted to enforce an arbitration provision in its contract with the Mazycks, which cost Arrowood the opportunity to have the matter tried before a jury. Furthermore, Arrowood contends that Jessco failed to cooperate during the litigation as it did not provide Arrowood with copies of the Mazycks' experts' reports until after the arbitration had already begun; thus, it limited their effort to assist in the defense of the case. Builders Mutual generally asserts that the "30+ month delay substantially prejudiced Builders Mutual's ability to investigate, manage, handle, and/or settle the Mazycks' claims."

In response, Jessco argues that the initial complaints asserted by the Mazycks involved minor construction repairs and that it believed it could handle the dispute without drawn out litigation. Then, according to Jessco,

> well over two years following the filing of the Complaint, the Mazycks began to obtain expert reports showing the extent of the claimed damage to the entire structure, and began to complain of substantial defects, not directly caused by Jessco's failure to complete minor punch list tasks but involving water damage to their house.

(Mem. in Opp. to Arrowood's Mot. for Summ. J at 14.) It was at this time that Jessco believed it received notice of an occurrence that might give rise to a claim against Jessco that was covered under its policies with Arrowood and Builders Mutual. In response to Arrowood's contention that it missed out on the opportunity to try the dispute with the Mazycks before a jury, Jessco asserts that the contract between it and the Mazycks contained a binding arbitration provision; therefore, Arrowood's involvement in the suit could not have prevented it. In response to Arrowood's contention that Jessco failed to supply it with the Mazycks' experts' report until arbitration is meritless, it contends that it forwarded the reports to Arrowood and Builders Mutual soon after it received them from the Mazcyks, which happened to be during the arbitration.

While the court does not find that Jessco notified Arrowood and Builders Mutual about the underlying litigation with the Mazycks as soon as reasonably possible, the court finds that neither Arrowood nor Builders Mutual has met their burden of showing that they were substantially prejudiced by this delay. Although they may have opted for a jury trial rather than a hearing before an arbitrator, it has not shown that they suffered substantial prejudice as a result. They still had the opportunity to defend Jessco at the hearing had they not disclaimed their duty to defend. Also, it has been the court's experience that defendants and insurers usually prefer arbitration and plaintiffs usually prefer jury trials.

Additionally, while Arrowood and Builders Mutual failed to receive the Mazycks' experts' reports prior to the Mazycks presenting their case before the arbitrator, on October 22 and 23, 2008, it appears they did have them prior to Jessco presenting its case-in-chief before the arbitrator on December 15, 2008. Moreover, both insurance companies already disclaimed their duties to defend prior to arbitration hearing; therefore, it appears inapposite that Arrowood would argue that this alleged failure to comply limited its ability to assist in a defense in this case. Finally, the court finds it worth noting that the Mazycks' experts' opinions proved favorable to Jessco's, as well as Arrowood's and Builders Mutual's, positions. Therefore, the court denies Arrowood's and Builders Mutual's Motions for Summary Judgment on the ground that Jessco failed to timely notify them of the underlying litigation since they failed in their burden of proof.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendant Arrowood Indemnity Company's and Defendant Builders Mutual Insurance Company's Motions for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART**. The court finds that the Mazycks' claims related to the grinder pump and the punch list items are not covered under either policy; however, the Mazycks' claims related to the flooding of their property and the resulting property damage to their yard and garage constitute occurrences under both policies. Therefore, the court finds that Arrowood's and Builders Mutual's policies provide coverage for any sums Jessco is required to pay as a result of property damage resulting from that occurrence.[3]

   **AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**September 22, 2009**
**Charleston, SC**

---

[3] Prior to the policy in question, Arrowood issued to Jessco a CGL policy with effective dates of April 15, 2002 to April 15, 2003. In its Memorandum in Opposition, Plaintiff admitted that this particular policy "had lapsed prior to the parties in the underlying action entering into their contract, and would therefore withdraw any claim it may have under that policy." (Mem. in Opp. at 2.) Therefore, the court grants Arrowood's Motion for Summary Judgment as to any claims asserted by Plaintiff regarding this first CGL policy issued by Arrowood.